UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA ANN OVERSTREET, | ) | Case No. 1:20-CV-00645 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I.    Introduction**

Lisa Overstreet, Plaintiff, seeks judicial review of the final decision of Andrew Saul, the Commissioner of Social Security. The Commissioner denied Overstreet's application for supplemental security income under Title XVI the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

**II.    Procedural History**

Overstreet applied for supplemental security income on April 5, 2016. (ECF No. 12, PageID #: 82). She alleged a period of disability beginning on July 1, 2015. (ECF No. 12, PageID #: 82). The Ohio Division of Disability Determination (the "State Agency") initially denied Overstreet's claim on May 31, 2016. (ECF No. 12, PageID #: 82). The State Agency denied it again on October 12, 2016. (ECF No. 12, PageID #: 82). On December 14, 2016, Overstreet submitted a written request for a hearing before an ALJ. (ECF No. 12, PageID #: 82). ALJ George Roscoe presided over Overstreet's hearing on February 7, 2018, but the hearing was cut short

because Overstreet—who appeared that day *pro se*—decided to seek legal representation before proceeding with a hearing on the merits. (ECF No. 12, PageID #: 112-118). Thereafter, Overstreet retained counsel. (ECF No. 12, PageID #: 110). ALJ Roscoe presided over a full hearing on November 27, 2018. (ECF No. 12, PageID #: 82). Overstreet appeared through attorney Andrew November and testified. (ECF No. 12, PageID #: 96-105). Mark Anderson testified as an impartial vocational expert. (ECF No. 12, PageID #: 105-07).

The ALJ issued his decision on December 17, 2018. (ECF No. 12, PageID #: 79-90). He determined that Overstreet was not disabled under the Social Security Act. (ECF No. 12, PageID #: 79-90). Overstreet timely asked the Appeals Council to review and set aside the ALJ's ruling. (ECF No. 12, PageID #: 68). The Appeals Council denied Overstreet's request on January 23, 2020. (ECF No. 12, PageID #: 68-73). Overstreet's administrative decision was, thus, final as of that date.

This timely appeal followed. (ECF No. 1).

## III.    Relevant Background[1]

### A.    Overstreet's Testimony

> The claimant testified that she was uncomfortable at her last job. When she feels uncomfortable and gets anxious she tries to get away. She stated that her depression makes her sad and cry for no reason. She stated that she recently started treating at Guidestone as of July. As far as her energy, she stated that she is tired but is able to sleep through the night. She has an increased appetite, and stated that she gained 30 pounds in a month or so. She has difficulty concentrating. She stated that she gets panic attacks and her arms and hands tingle, and she feels like she is going to pass out. She stated that she gets the panic attacks 4-6 times per day.

(ECF No. 12, PageID #: 86-87).

---

[1] The ALJ's narratives of the relevant hearing testimony, medical evidence, and opinion evidence provide useful background for this Report and Recommendation. The Court has supplemented those narratives as necessary to address the parties' arguments.

### B.    Medical Evidence

A mental status exam was recorded in July of 2014. It noted that the claimant was depressed, anxious, and irritable. However, it further noted that the claimant had a full affect, and a cooperative behavior. She presented with poor insight and judgment. (1F/3). April of 2015 notes showed the claimant to be properly oriented to time, place, and person. Her affect was constricted and she had an irritable mood. Her speech was clear, and her concentration was mildly impaired. Her memory was intact in all three spheres, and her judgment was limited. (1F/15).

In April of 2016, the claimant reported a stable mood, and was pleasant and easy to engage in conversation. She reported good sleep, good appetite, but admitted to frequent drinking. (3F/104). In May, she again reported a stable mood, good sleep, and appetite. (6F/32). She reported doing too good. Says she was thinking about overdosing on her meds few days ago and since threw them out. She denied any history of attempted overdose or ingestion. Denied suicidal ideations, but has chronic suicidal and parasuicidal gestures[,] including wrist cutting (not in several months). Sleeping is improved, however, and no longer requiring Trazodone. She wanted to consider therapy. She admitted to still using marijuana, cigarettes, but actively cutting back her drinking. (6F/39).

In August of 2016, the claimant stated that she was doing better overall, and denied suicidal ideations. She continues to drink on the weekends and uses marijuana. She stated she smokes joints and blunts. She denied depressed mood at this time, and stated she has not cut in a 'long time, since before the last appointment.' Per chart review, she has chronic suicidal and parasuicidal gestures. She endorses trouble sleeping and would like to take trazodone as she believes this helped her previously. States she does not want pill-minders anymore as she has not conveyed suicidal ideations in quite some time. She vehemently denied suicidal and homicidal ideations, as well as auditory and visual hallucinations. Especially denied thoughts of overdosing. (6F/85).

Vocational Guidance Services notes were recorded. It was noted in January of 2017 that the claimant showed up on time but seemed very uncomfortable. When asked if she was ok the claimant said yes and asked if she can work alone because she does not want to work with anyone. When the case manager asked if she was going to be able to make it through the program at that time[, Overstreet] assured case manager that she will be able too. She went on task and vacuuming but did not seem to want to do much of anything else.

> After a lunch break on January 17, 2017, the claimant did not return but told [a] counselor that she was having issues and had to leave. (7F/14).

(ECF No. 12, PageID #: 87-88).

### C.  Opinion Evidence

#### 1.  State Agency Psychological Consultant: Initial Consideration

Thomas Ruf, Ph.D., a State Agency psychological consultant, opined on Overstreet's mental functioning during the initial-consideration process. (ECF No. 12, PageID #: 123-28). He noted that Overstreet had three severe mental impairments: (1) affective disorder; (2) anxiety disorder; and (3) substance addiction disorders. (ECF No. 12, PageID #: 123). He stated that her primary symptoms were "understanding and memory limitations[;] sustained concentration and persistence limitations[;] social interaction limitations[; and] ability to adapt limitations." (ECF No. 12, PageID #: 124). He concluded that Overstreet's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence alone. (ECF No. 12, PageID #: 125). He opined that Overstreet's statements were only partially consistent with the total medical and non-medical evidence in the file. (ECF No. 12, PageID #: 125). He noted that Overstreet sought "[o]ther [m]easures to relieve [her] symptoms" and showed a "[l]ack of treatment seeking behavior." (ECF No. 12, PageID #: 125). Ultimately, he opined that Overstreet's mental impairments, when viewed under either the "paragraph B" or "paragraph C" criteria, did not compel a finding that she was disabled. (ECF No. 12, PageID #: 123-24).

Ruf also opined on Overstreet's mental RFC. He stated that she had limitations in: (1) memory and understanding; (2) sustained concentration and persistence; (3) social interactions; and (4) adaptation. (ECF No. 12, PageID #: 126-27). For memory and understanding, Ruf opined

4

that Overstreet was not significantly limited in two abilities, but moderately limited in her ability to understand and remember detailed instructions. (ECF No. 12, PageID #: 126). He elaborated on that conclusion, stating that Overstreet "completes simple and multi-step ADL's but D/t depression, PTSD[,] and polysubstance abuse[. S]he can be expected to have some interference from her [symptoms]. [She] retains the ability to understand and remember simple 1-3 step instructions to complete 1-3 step tasks." (ECF No. 12, PageID #: 126).

For sustained concentration and persistence, Ruf opined that Overstreet was not significantly limited in four abilities, but moderately limited in four others: (1) carrying out detailed instructions; (2) maintaining attention and concentration for extended periods; (3) working in coordination with or in proximity to others without being distracted by them; and (4) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (ECF No. 12, PageID #: 126). Ruf elaborated in narrative form, restating his opinion from the memory and understanding analysis, then adding that Overstreet "retains the capacity to perform work which is not fast-paced and does not have strict production quotas. Due to her reported anxiety around other people, she also requires work conditions in which she has only brief and superficial contact with coworkers. [Overstreet] requires infrequent flexibility regarding breaks in and when her symptoms increase at work." (ECF No. 12, PageID #: 126-27).

For social interactions, Ruf opined that Overstreet was not significantly limited in two abilities, but moderately limited in three others: (1) interacting appropriately with the general public; (2) accepting instructions and responding appropriately to criticism from supervisors; and (3) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (ECF No. 12, PageID #: 127). Ruf further elaborated, first restating a portion of his

opinion about Overstreet's concentration and persistence, then stating that "given [her] depression and anxiety [symptoms] and the sensitivity to others' opinions that often accompany such disorders, she should have positive feedback from supervisors when merited and constructive feedback [only] when necessary." (ECF No. 12, PageID #: 127).

Finally, for adaptation, Ruf opined that Overstreet was not significantly limited in two abilities and that there was no evidence of a limitation in another, but that she was moderately limited in her ability to respond appropriately to changes in the work setting. (ECF No. 12, PageID #: 127). He elaborated, stating that "[d]ue to her symptoms, [Overstreet] … can be expected to have moderate difficulty adapting to changes. She is capable of adapting in a work environment with infrequent changes, advanced notice of significant changes[,] and gradual implementation of such changes." (ECF No. 12, PageID #: 127).

As a final summary, Ruf provided a narrative "additional explanation" concerning Overstreet's mental RFC:

> [Overstreet's] statements [are] partially consistent. [She is a]lleging disability d/t bipolar d/o, PTSD, [and] anxiety d/o. [The r]ecord indicates [that Overstreet] w/h/o depression, anxiety[,] and limited functioning. Evidence as early as 4/15 indicates [that Overstreet] w/sxs consistent with bereavement. She was abusing alcohol at that time. [Overstreet] presented to CENTER multiple times b/w 10/15 and 4/16. Compliance with treatment has varied and [Overstreet] has more often than not reported alcohol and [marijuana] abuse. [Overstreet] presented for multiple doctor visits and left before [being] seen. In addition, the record shows multiple psych visit cancellations. Rec[ords] indicate [Overstreet] taking meds as prescribed as of 12/15 and some symptom improvement was noted. She continued to report freq[uent] panic attacks and anger outbursts (AND FREQUENT DRINKING). MSEs at recent visit are improved and described as 'baseline' and 'stable.' While the evidence suggests the presence of severe impairments, the totality of the record does not indicate that they are disabling in severity.

(ECF No. 12, PageID #: 127-28).

6

2.    **State Agency Psychological Consultant: Reconsideration**

Courtney Zeune, Psy.D., opined on Overstreet's file during the reconsideration process. She too noted that Overstreet was moderately limited in her ability to maintain social functioning and maintain concentration, persistence, and pace. (ECF No. 12, PageID #: 138). She agreed with Ruf that Overstreet did not meet either the "paragraph B" or "paragraph C" criteria. (ECF No. 12, PageID #: 138). Zeune also agreed that Overstreet had limitations in understanding and memory as well as social interactions, and that Overstreet's statements were only partially consistent with the total medical and non-medical evidence in the file. (ECF No. 12, PageID #: 139).

Zeune also opined on Overstreet's RFC. Zeune adopted Ruf's findings and opinion verbatim for understanding and memory limitations, concentration and persistence limitations, social interactions, and adaptation. (ECF No. 12, PageID #: 140-41). Zeune adopted Ruf's narrative "additional explanation" of Overstreet's medical findings. (ECF No. 12, PageID #: 141-42).

D.    **Anderson's Vocational-Expert Testimony**

The ALJ asked Anderson for his vocational-expert opinion on the following hypothetical:

> I'm going to define the vocation level or experience level likely to assume of an individual 33 years old, has an eighth grade limited education, can read and write, [do] simple arithmetic, again no work background of significance. This individual does not have exertional limitations.
>
> She can perform simple, routine tasks in a low-stress environment, no fast pace, strict quotas or frequent duty changes, involving superficial interpersonal interactions with coworkers and supervisors, specifically no arbitration, negotiation or confrontation and no interaction with the general public is a job requirement.

(ECF No. 12, PageID #: 106). The ALJ summarized Anderson's response like so:

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of

7

> representative occupations such as hand packager, DOT code
> 920.587-018, with an SVP of 2, listed at the medium exertional
> level, and approximately 1,500,000 jobs in the national economy. A
> laundry worker, DOT code 361.687-018 with an SVP of 2, listed at
> the medium exertional level, and approximately 420,000 jobs in the
> national economy. An inspector, DOT code 559.687-074 with an
> SVP of 2, listed at the light exertional level, and approximately
> 235,000 jobs in the national economy.

(ECF No. 12, PageID #: 89). Anderson confirmed that his testimony was consistent with the DOT and that the representative jobs were only "some examples [of available work], not an exhaustive list." (ECF No. 12, PageID #: 106).

The ALJ then asked Anderson to "assume the same parameters but with the additional limitation that due to symptoms of medically determinable impairments, consider this individual cannot task at least 20 percent of the time." (ECF No. 12, PageID #: 106). Anderson replied that

> 20 percent is beyond the acceptable level. For guidance, I use an
> engineering system[—] modus, methods, time, measurement[—]as
> the DOT doesn't deal with all tasks. The MMTM system builds in
> nine minutes or 15 percent of any hour a day for someone to be off
> task. At 20 percent, they're not employable.

(ECF No. 12, PageID #: 107).

Overstreet's counsel then examined Anderson. Counsel elicited the following testimony:

> [Attorney]    Does the employer or the employee schedule breaks?
>
> [Anderson]    The employer.
>
> [Attorney]    Especially in the unskilled work, isn't it correct that an employee is expected to abide by the break schedule?
>
> [Anderson]    Generally, yes.
>
> [Attorney]    If an employee requires flexibility in scheduling breaks up to a third of the time, they would likely not remain competitive. Correct?
>
> [Anderson]    That is correct.

8

[Attorney]     After the probationary period, is an employee expected to perform a job without the need for positive and negative feedback?

[Anderson]     That's true.

[Attorney]     So if an employee needs positive or negative feedback to perform their job, they would likely not remain competitive. Correct?

[Anderson]     It depends on the level of interaction, but if they're interacting on a regular basis, then they're not employable competitively.

(ECF No. 12, PageID #: 107).

## IV.     The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

> **3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**
>
> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06…
>
> In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant alleged that she has difficulty remembering generally and completing tasks. However, the claimant also stated that she could go to doctor's appointments. In addition, the record shows that the claimant was able to follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers, and there is no mention of any issues with the claimant's short- or long-term memory.
>
> In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that she has difficulty getting along with others and dealing appropriately with authority. Finally, the medical evidence shows that the claimant had a good rapport with providers and appeared comfortable during appointments.
>
> The next functional area addresses the claimant's ability to

concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that she has limitations in concentrating generally, completing tasks, and working with others without distracting them. On the other hand, the claimant said that she is also able to handle her own medical care.

Finally, the claimant has moderate limitations in her ability to adapt or manage herself. The claimant asserted that she has difficulties managing her mood. That said, the claimant also stated that she is able to handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, and normal mood and affect.

…

**4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 416.945) to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation[,] or confrontation), and no interaction with the general public as a job requirement (20 CFR 416.969a).**

…

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

…

As for the opinion evidence, great weight is given to the Disability Determination Services consultants. They opined that the claimant retains the ability to understand and remember simple 1-3 step instructions to complete 1-3 step tasks. She requires work duties in which she has only infrequent, brief and superficial contact with members of the public, coworkers and supervisors. (See 3A). This is consistent with the medical evidence of record. However, the

10

record further supports the finding that the claimant should have no interaction with the general public, and therefore, no more than great weight can be given.

…

In sum, the above residual functional capacity assessment is supported by both the subjective and objective medical evidence of record. Although the record documents the claimant's struggles with alcohol and drug use, it is not material to the determination. Despite the absence of alcohol and drugs at times, the claimant still had symptoms related to h[er] mental impairments. No doctor opined that the claimant's drug and alcohol use is a contributing factor to her mental impairments, or that they would be diminished in their absence. For these reasons, the claimant's drug and alcohol use is a condition, but is not material to the decision. After a thorough review of the evidence of record, including the claimant's allegations and testimony, forms completed at the request of Social Security, the objective medical findings, medical opinions, and other relevant evidence, the undersigned finds the claimant capable of performing work consistent with the residual functional capacity established in this decision.

…

**9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

[B]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

…

**10. The claimant has not been under a disability, as defined in the Social Security Act, since April 5, 2016, the date the application was filed (20 CFR 416.920(g)).**

(ECF No. 12, PageID #: 85-89 (bolding in original)).

## V.      Law and Analysis

### A.      Standard of Review

The Court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("An administrative decision is

12

not subject to reversal merely because substantial evidence would have supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position, too. *See Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, *i.e.*, "fails to follow its own regulations," unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is not harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement because it ensures that a claimant will understand the ALJ's reasoning. *E.g. Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, App'x 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.     The ALJ Properly Found that Overstreet Was Not Disabled Under Listings 12.04 and 12.06**

Overstreet first argues that the ALJ "failed to properly evaluate the totality of the evidence in the record" when considering Overstreet's claim under listings 12.04 and 12.06. (ECF No. 15, PageID #: 730). Overstreet argues that the record compels greater than moderate limitations in each of the four "paragraph B" criteria: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (ECF No. 15, PageID #: 730); 20 C.F.R. § 416.920a(c)(3).

The Commissioner argues that the ALJ reasonably concluded that Overstreet had no more than moderate limitations in any of the "paragraph B" criteria of the listings. (ECF No. 17, PageID #: 750-53). The ALJ found that Overstreet did not meet Listings 12.04 or 12.06 because she had only moderate limitations in each of the four areas of functioning. (ECF. No. 12, PageID #: 85).

Listings-based analyses occur at the third step of the sequential five-step disability evaluation. 20 C.F.R. § 1520(a)(4)(iii). At that step, the Commissioner considers whether the claimant "ha[s] an impairment(s) that meets or equals one of our listings in Appendix 1 of 20 C.F.R. § 404, Subpart P] and meets the duration requirement," as relevant. 20 C.F.R. §

1520(a)(4)(iii). The Commissioner's regulations note that analyzing

> functional limitations is a complex and highly individualized process that requires [the Commissioner] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation. [The Commissioner] will consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

> [The commissioner] will rate the degree of [the claimant's] functional limitation based on the extent to which [the claimant's] impairment(s) interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis. Thus, [the commissioner] will consider such factors as the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function…

> [The Commissioner has] identified four broad functional areas in which [the Commissioner] will rate the degree of [the claimant's] functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself…

20 C.F.R. § 1520a(c)(i-iii).

"Paragraph B" compels the ALJ to consider the claimant's capabilities under the four broad functional criteria listed above. Each criterion is ranked by severity: none, mild, moderate, marked, or extreme. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2). A *none* finding means that the claimant is "able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(a). A *mild limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(b). A *moderate limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Part 404, Subpart P,

15

Appendix 1, 12.00(F)(2)(c). A *marked limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(d). And an *extreme limitation* means that the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(e).

### 1.    Ability to Understand, Remember, and Apply Information

Overstreet first objects to the ALJ's analysis of her ability to understand, remember, and apply information. Overstreet argues that the ALJ's finding "is contrary to the medical evidence in the record." (ECF No. 15, PageID #: 730). Overstreet states that "[w]hen [she] was at Murtis Taylor[ Human Services, a mental-health-services provider], it was noted that she had memory problems along with suicidal ideation, aggressive behavior, auditory hallucinations, loose and racing thought processes, depressed mood, and poor insight and judgment." (ECF No. 15, PageID #: 730-31 (citing ECF No. 12, PageID #: 334-35). Overstreet also states that she "relied on her case manager to schedule and transport her to medical appointments." (ECF No. 15, PageID #: 731 (citing ECF No. 12, PageID #: 421, 427, 430, 449, 453, 459, 471, 484, 595, 601, 611, 612, 630, 645)). Overstreet notes that she "had a history of not showing for medical appointments when the case manager did not transport her." (ECF No. 15, PageID #: 731 (citing ECF No. 12, PageID #: 414-16, 423, 574, 580, 585, 603, 613, 622, 628, 641, 650)). Finally, Overstreet points out that "the nurse practitioner arranged her medications in a 1, 2, or 3-week pill planner." (ECF No. 15, PageID #: 731 (citing ECF No. 12, PageID #: 456, 468, 478, 502, 565, 577, 589, 591).

The Court concludes that substantial evidence supports the ALJ's finding in this area of functioning. A moderate limitation in this area denotes a fair level of independent, appropriate, and effective ability to understand, remember, and apply information on a sustained basis. 20

C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(c). The ALJ first noted that Overstreet "alleged that she has difficulty remembering generally and completing tasks." (ECF No. 12, PageID #: 85). Then the ALJ noted that Overstreet "could go to doctor's appointments." (ECF No. 12, PageID #: 85). The record supports this, as Overstreet stated (with the help of her case manager) that she leaves her house for doctor's appointments with reminders from her case management team. (ECF No. 12, PageID #: 122, 264-65). The ALJ also noted that Overstreet is "able to follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers…" (ECF No. 12, PageID #: 85). Overstreet's statement supports this, too, as it notes that she takes her prescriptions as they are set out in two-week pill reminders. (ECF No. 12, PageID #: 262-63). Similarly, Overstreet's records indicate that, in many instances, she was "actively engaged" and that she "participated" in her clinical interventions. (*E.g.* ECF No. 12, PageID #: 413, 421, 427, 429, 435, 436, 445, 449, 453, 455, 458, 463, 464, 465, 466, 471, 472, 477, 479, 480, 481, 484, 485, 488, 489, 491, 492, 497, 499, 500, 501). In other records, she is described as at least "partially engaged." (*E.g.* ECF No. 12, PageID #: 418, 419, 430, 431, 440, 450, 459). And in many treatment notes, she is described as "adherent with current medications." (*E.g.* ECF No. 12, PageID #: 446, 456, 468, 478, 482, 490, 502). Moreover, in her submission, Overstreet noted that she makes frozen meals daily by following the "package instructions." (ECF No. 12, PageID #: 263). Finally, the State Agency psychological consultants also opined that Overstreet was moderately limited in this area. (ECF No. 12, PageID #: 126, 140). This evidence is substantial because a reasonable person might accept it as adequate support for the conclusion that Overstreet has only moderate limitations in understanding, remembering, and applying information. *Rogers*, 486 F.3d at 241.

The facts that Overstreet highlights do not change that conclusion, as Overstreet merely

highlights different evidence that could support a different conclusion. This amounts to asking the Court to reweigh the evidence. The Court cannot do so: The ALJ's decision "must be affirmed if … [his] findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision." *Elam*, 348 F.3d at 125. Overstreet is correct that there is some conflicting evidence in the record concerning her ability to attend doctor's appointments independently. But where there is conflicting evidence, as there is here, the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him, provided that his decision is supported by substantial evidence. *Mullen*, 800 F.2d at 545. Because substantial evidence supports the ALJ's finding in this area of functioning, it should not be disturbed.

### 2. Abilities to Interact with Others and Concentrate, Persist, and Maintain Pace

Overstreet next objects to the ALJ's analysis of her abilities to interact with others and concentrate, persist, and maintain pace. She discusses the two areas of functioning together. (ECF No. 15, PageID #: 731). Overstreet again points out that she "often did not appear for her appointments and relied on her case manager to schedule and transport her to the appointments." (ECF No. 15, PageID #: 731). She also states that, "when she tried training through Vocational Guidance Services, she walked out either before training or after only vacuuming as she seemed very uncomfortable." (ECF No. 15, PageID #: 731). Overstreet then notes that "[s]he also testified at the hearing that she would leave [any situation] if she became uncomfortable." (ECF No. 15, PageID #: 731). Finally, Overstreet states that "[t]he ALJ's statements do not reflect the evidence in the record and constitute harmful error." (ECF No. 15, PageID #: 731).

The Court concludes that substantial evidence supports the ALJ's finding concerning Overstreet's ability to interact with others. A moderate limitation in this area denotes a fair level

of independent, appropriate, and effective ability to interact with others on a sustained basis. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(c). To support his finding of a moderate limitation in this area, the ALJ first noted that Overstreet "has difficulty getting along with others and dealing appropriately with authority." (ECF No. 12, PageID #: 85). The ALJ then noted that Overstreet "had a good rapport with providers and appeared comfortable during appointments." (ECF No. 12, PageID #: 85). This rationale is supported by the record. (*E.g.*, ECF No. 12, PageID #: 565, 577, 589, 591 (describing Overstreet as, among other things, "pleasant," "relaxed," and "easy to engage in conversation")). Moreover, Overstreet testified that she got along with her supervisors at VGS when she was there—even though she walked off of the job site a few times. (*See* ECF No. 12, PageID #: 104-05 ("Yeah. I still got along with them.")). Finally, the State Agency psychological consultants also opined that Overstreet was moderately limited in this area. (ECF No. 12, PageID #: 126, 140). Thus, substantial evidence supports the ALJ's finding in this area.

The Court also concludes that substantial evidence supports the ALJ's finding concerning Overstreet's ability to concentrate, persist, and maintain pace. A moderate limitation in this area denotes a fair level of independent, appropriate, and effective ability to concentrate, persist, and maintain pace on a sustained basis. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(c). To support his finding of a moderate limitation in this area, the first noted that Overstreet "has limitations in concentrating generally, completing tasks, and working with others without distracting them." (ECF No. 12, PageID #: 85). The ALJ then noted that Overstreet "is also able to handle her own medical care." (ECF No. 12, PageID #: 85). As discussed above, this, too, is generally supported in the record. The ALJ also referenced an April 2015 treatment note that indicated that Overstreet's concentration was only mildly impaired; her memory was intact in all

19

three spheres and her judgment was limited." (ECF No. 12, PageID #: 87 (citing ECF No. 12, PageID #: 347)). Finally, the State Agency psychological consultants also opined that Overstreet was moderately limited in this area. (ECF No. 12, PageID #: 127, 141). Together, this is substantial evidence that Overstreet is only moderately limited in her ability to concentrate, persist, and maintain pace.

As with her objection to the ALJ's finding for understanding, remembering, and applying information, Overstreet does not argue that the evidence that the ALJ relied on here is not supported by the record; she merely highlights competing evidence. Where there is conflicting evidence, as there is here, the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him, provided that his decision is supported by substantial evidence. *Mullen*, 800 F.2d at 545. Because substantial evidence supports the ALJ's findings in these areas of functioning, they should not be disturbed.

### 3. Ability to Adapt and Manage Oneself

Overstreet next objects to the ALJ's finding concerning her ability to adapt and manage herself. (ECF No. 15, PageID #: 731-32). She notes that "[t]he ALJ failed to note that Overstreet had anger outbursts at least once a day, and had suicidal ideation and behavior." (ECF No. 15, PageID #: 731-32 (citations omitted)).

The Court concludes that substantial evidence supports the ALJ's finding concerning Overstreet's ability to concentrate, persist, and maintain pace as well. A moderate limitation in this area denotes a fair level of independent, appropriate, and effective ability to concentrate, persist, and maintain pace on a sustained basis. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(c). The ALJ first noted that Overstreet "has difficulties managing her mood." (ECF No. 12, PageID #: 85). The ALJ then stated that Overstreet "also stated that she is able to handle self-care and

personal hygiene." (ECF No. 12, PageID #: 85). Overstreet's submission supports this. Her submission states that she takes care of her own personal hygiene but "needs reminders for oral hygiene." (ECF No. 12, PageID #: 262). Her submission also states that she "is capable of making breakfast food and frozen dinners," that she follows the package instructions, and she "does her own laundry and housekeeping" (ECF No. 12, PageID #: 263), all of which support her ability to adapt and manage herself. Finally, the State Agency psychological consultants also opined that Overstreet was moderately limited in this area. (ECF No. 12, PageID #: 127, 141). Together, this is substantial evidence that Overstreet is only moderately limited in her ability to adapt and manage herself.

Once again, Overstreet does not argue that the evidence that the ALJ relied is not supported by the record; she merely highlights competing evidence. Where there is conflicting evidence, as there is here, the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him, provided that his decision is supported by substantial evidence. *Mullen*, 800 F.2d at 545. Because substantial evidence supports the ALJ's finding in this area of functioning, it should not be disturbed.

### 4.    The ALJ Properly Considered the Medical and Non-Medical Evidence of Record

Finally, Overstreet alleges in passing that "[t]he ALJ failed to consider all of Overstreet's symptoms," arguing that the ALJ "made generalizations which are contradicted by the record as set forth above." (ECF No. 15, PageID #: 732). Overstreet objects particularly to the ALJ's written narrative concerning her time at Vocational Guidance Services during August 2016. (ECF No. 15, PageID #: 732). She alleges that the ALJ "clearly did not consider the effect of the combination of Overstreet's impairments" because the ALJ "fail[ed] to note that [Overstreet] left early during her first two days [at and then failed to appear or call" her work placement. (ECF No. 15, PageID #:

21

732).

The Court concludes that the ALJ did not fail to consider the medical and non-medical evidence in the record. As Overstreet concedes, "[t]he ALJ discussed … in his decision" the very records that Overstreet argues he omitted. (ECF No. 15, PageID #: 732 (quoting ECF No. 12, PageID #: 87-88)). "[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *accord Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Notably, there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002). Further, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). The Court concludes that the ALJ sufficiently narrated this portion of the record evidence, and these events in particular. Overstreet's argument that the ALJ's narrative of this event "constitute[s] harmful and reversible error" (ECF No. 15, PageID #: 732) is meritless.

Separately, Overstreet briefly states that the ALJ "found that the GAF of 41 (serious symptoms) was given little weight as it was of limited evidentiary value." (ECF No. 15, PageID #: 732). The Court construes this to be an argument that the ALJ erred in according little weight to the GAF score. Because Overstreet's argument is conclusory and unsupported, it is waived.[2]

---

[2] In *Hollon v. Comm'r of Soc. Sec.*, the Sixth Circuit declined to review the substance of an argument that the petitioner had "made little effort to develop … in her brief." 447 F.3d 477, 491 (6th Cir. 2006). The court noted that it "decline[d] to formulate arguments on [the petitioner]'s

But even if the argument were not waived, the Court concludes that the ALJ did not err by according little weight to Overstreet's 2014 GAF score. "The range 41–50 is described as appropriate for 'Serious' symptoms." *Tinsley v. Astrue*, No. 1:08-CV-31-J, 2008 WL 4724494, at *2 (W.D. Ky. Oct. 23, 2008). Despite this, the Sixth Circuit has stated that

> the Global Assessment Functioning score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. We have previously held that the failure to reference a Global Assessment Functioning score is not, standing alone, sufficient ground to reverse a disability determination. Moreover, the Commissioner has declined to endorse the Global Assessment Functioning score for use in the Social Security and Supplemental Security Income disability programs and has indicated that Global Assessment Functioning scores have no direct correlation to the severity requirements of the mental disorders listings. Accordingly, we have affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower.

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (cleaned up); *accord Kornecky*, 167 F. App'x at 511 ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.")

"Nonetheless, the GAF does represent one piece of information to be considered in a disability inquiry." *Tinsley*, 2008 WL 4724494, at *2. The ALJ satisfied his duty by considering the GAF score despite its limited evidentiary utility:

> [Overstreet's] GAF scores are inconsistent with the treatment notes from that same time period. A score of 41 equates to serious symptoms, which is not supported by the record. The record supports only moderate symptoms. For these reasons, the undersigned gives little weight to the GAF scores documented in the

---

behalf, or to undertake an open-ended review of the entirety of the administrative record to determine (i) whether it might contain evidence that arguably is inconsistent with the [ALJ]'s decision, and (ii) if so, whether the [ALJ] sufficiently accounted for this evidence." *Id.* Instead, the court "limit[ed its] consideration to the particular points that [the petitioner] appears to raise…" *Id.* So too here, as Overstreet mentions the ALJ's alleged error only once without analyzing the facts and law at issue.

treatment records.

(ECF No. 12, PageID #: 88). The ALJ's decision to accord little weight to the GAF score is supported by the substantial evidence discussed above in analyzing the ALJ's finding that Overstreet is only moderately limited under the listings. Accordingly, the ALJ did not err in giving this low GAF score little weight, and that finding should not be disturbed.

\*       \*       \*

In conclusion, substantial evidence supports the ALJ's finding that Overstreet has only moderate limitations in each of the four "paragraph B" criteria. Substantial evidence also supports the ALJ's overall narrative and decision to accord little weight to Overstreet's 2014 GAF score. Accordingly, the ALJ's findings in these areas should not be disturbed.

### C.    The ALJ's Step Five Finding Is Supported by Substantial Evidence

Overstreet next argues that the ALJ "did not meet his burden … of showing that Overstreet could perform work that is available in the national economy…" (ECF No. 15, PageID #: 735-36 (titling her argument "[t]he ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation")). Overstreet asserts that the ALJ relied on Anderson's opinion to a hypothetical that did not "accurately portray[ Overstreet]'s physical and mental impairments." (ECF No. 15, PageID #: 736 (citing *Howard v. Comm'r of Soc. Sec.*, 276 F. 3d 235, 238 (6th Cir. 2006))).

The Commissioner argues that Overstreet's argument "lacks relevance because the ALJ ultimately found that the limitations posed by Plaintiff's counsel were not supported by the record evidence." (ECF No. 17, PageID #: 754). The Commissioner cites to *Salyer v. Comm'r of Soc. Sec.*, 574 F. App'x 595, 596 (6th Cir. 2014), for that proposition. (ECF No. 17, PageID #: 754 ("[T]hough the VE testified that Salyer's job prospects would diminish if certain hypothetical

24

conditions applied, that testimony lacks relevance because in fact the ALJ found that none of those conditions applied.")).

Before analyzing whether substantial evidence supports the ALJ's Step Five finding, the Court notes that Overstreet embedded two collateral challenges[3] to the RFC in her Step Five argument. They concern the ALJ's decision to not include in the RFC two opinions from the State Agency psychological consultants that Overstreet: (1) could use flexibility in scheduling breaks; and (2) would benefit from positive and negative feedback while on the job. (ECF No. 15, PageID #: 736). But Overstreet squarely argues in this second issue that the ALJ erred at Step Five without first arguing that the ALJ erred in fashioning the RFC before Step Four. Thus, Overstreet has failed to challenge the RFC at the proper point in the sequential analysis. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." (emphasis added)). It is well settled that if a Claimant has not established limitations to be included in an RFC by step four, then the burden does not shift to the Commissioner to prove an RFC—or its limitations—at Step Five. *Id*. at 392. Thus, Overstreet's attempt to shift the burden of proving the RFC onto the Commissioner at Step Five is improper. Accordingly, the Court will analyze the ALJ's Step Five finding under the RFC as the ALJ found it.[4]

The Court concludes that the ALJ's Step Five finding is supported by substantial evidence: Anderson's vocational-expert testimony. It is well established that "[a] vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where

---

[3] Overstreet alleges that the ALJ erred by not adopting verbatim the State Agency psychological consultants' opinions. (ECF No. 15, PageID #: 736). She also alleges that the ALJ "cherry pick[ed]," *i.e.*, impermissibly parsed, their findings to support his conclusion.[3] (ECF No. 15, PageID #: 736).

[4] Nevertheless, the Court addresses Overstreet's collateral RFC challenges below.

the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). Here, the ALJ asked Anderson to opine on a hypothetical individual without exertional limitations that

> can perform simple, routine tasks in a low-stress environment, no fast pace, strict quotas[,] or frequent duty changes, involving superficial interpersonal interactions with coworkers and supervisors, specifically no arbitration, negotiation or confrontation and no interaction with the general public is a job requirement.

(ECF No. 12, PageID #: 106). That hypothetical was identical to the RFC that the ALJ actually fashioned in this case, finding that Overstreet

> can perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the general public as a job requirement.

(ECF No. 12, PageID #: 86). Anderson testified that there was work in sufficient numbers in the national economy for an individual with Overstreet's RFC. (ECF No. 12, PageID #: 106). He testified about three representative occupations, and he testified that his testimony was consistent with the DOT. (ECF No. 12, PageID #: 106).

Because Anderson testified in response to a hypothetical that accurately set forth Overstreet's physical and mental impairments, Anderson's vocational-expert opinion is itself substantial evidence for the ALJ's Step 5 conclusion that there are jobs that exist in significant numbers in the national economy that Overstreet could do despite her limitations. *Smith*, 307 F.3d at 378. And because the ALJ relied on that testimony in his Step Five finding, the Court concludes that the ALJ did not err at Step Five. *Id.*

### D. Overstreet's Collateral RFC Challenges

### 1. The RFC Is Supported by Substantial Evidence

Even if Overstreet had directly challenged the RFC before challenging the ALJ's Step Five finding, the Court would still conclude that the ALJ did not err in fashioning it. The claimant's RFC "is the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a). The RFC denotes "functional limitations and restrictions and … [the claimant's] remaining capacities for work-related activities." Soc. Sec. Ruling 96-08p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ must "assess[] 'an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Stewart v. Comm'r of Soc. Sec.*, 881 F. App'x 349, 355 (6th Cir. 2020) (quoting SSR 96-08p, at *1). The ALJ must "consider [the claimant's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). A RFC determination is a legal finding, not a medical determination; thus, an "ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B)).

Here, the ALJ adopted the RFC that the State Agency psychological consultants opined, adding only that Overstreet requires "*no* interaction with the general public" (ECF No. 12, PageID #: 86 (emphasis added)), which the record supports. Overstreet has not challenged the validity or reliability of the State Agency psychological consultants' opinions; indeed, she asks the Court to rely on them. (*See* ECF No. 15, PageID #: 734 (citing Soc. Sec. Ruling 17-2p and calling the consultants "highly qualified medical sources who are also experts in the evaluation of medical issues")). Thus, the Court concludes that their opinions are substantial evidence for the RFC, as they provide far more than a scintilla of relevant evidence that a reasonable person might accept

as adequate to support the RFC. *Rogers*, 486 F.3d at 241.

### 2. The ALJ Did Not Err by Not Adopting Verbatim the State Agency Psychological Consultants' Opinions

Overstreet argues that the ALJ should have adopted in the RFC two additional specific limitations "regarding flexibility in scheduling breaks and needing positive or negative feedback to perform her job." (ECF No. 15, PageID #: 736). These potential limitations derive from "the written conclusions of the State Agency reviewing psychologists." (EFC No. 15, PageID #: 736 (citing ECF No. 12, PageID #: 126-27, 140-41)). These arguments are meritless. "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). The pertinent question in examining a potential RFC limitation is whether the medical evidence compels a specific, concrete restriction on the claimant's abilities. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436-37 (6th Cir. 2014) (concluding that additional RFC limitations on a claimant's ability to maintain attention, concentration, and pace were not required when a treating source's opinion did not place "any concrete functional limitations on [those abilities] when performing simple, repetitive, or routine tasks").

The Court concludes that the ALJ did not err by not including verbatim in the RFC a limitation for flexible break times. The opinion that a claimant needs flexible break times is not a concrete functional limitation that must be accounted for in an RFC unless it specifies a more precise restriction, such as requiring additional breaks or taking breaks at a specific frequency. *See Scott v. Saul*, No. 5:18-CV-2897, 2020 WL 2393155, at *3 (N.D. Ohio May 12, 2020) (noting that a "flexible break schedule" is ambiguous and imprecise, whereas "may need an occasional extra break" was sufficiently precise to require that it be included in the RFC). Moreover, the ALJ

28

limited Overstreet to only "simple, routine tasks in a low stress environment (no fast pace, strict quotas[,] or frequent duty changes)…" (ECF No. 12, PageID #: 86). Thus, the RFC already appropriately satisfies a non-specific limitation to flexible breaks. *See id.* (noting that limiting a claimant to "performing simple, repetitive tasks but not at production-rate pace" satisfies the non-specific limitation to flexible breaks, as it precludes "working on an assembly line, where everyone must take breaks at the same time or a specific time").

Nor did the ALJ err by not including verbatim in the RFC a limitation that Overstreet's supervisors should give her "positive feedback from supervisors when merited and constructive feedback [only] when necessary." (ECF No. 12, PageID #: 127). This opinion, too, is not a concrete limitation on Overstreet's ability to work; it is merely an observation of the best environment for Overstreet. In any case, this district has already concluded that the argument that "the ALJ erred because he did not include in [the] RFC a limitation assessed by the state agency reviewing psychologists that 'Supervisors should offer positive feedback when merited and constructive criticism when necessary'" is meritless. *See Jackson v. Saul*, No. 1:18CV2362, 2019 WL 5802497, at *12 (N.D. Ohio Sept. 3, 2019) (quoting *Reeves*), *adopted by Jackson v. Saul*, 2020 WL 858061 (N.D. Ohio Feb. 21, 2020).

### 3.    The ALJ Did Not Impermissibly Parse the Record

Overstreet also appears to challenge the RFC by alleging that the ALJ "[c]herry pick[ed] the findings of the reviewing psychologists" in fashioning it. (ECF No. 15, PageID #: 736). This argument is conclusory and undeveloped; thus, it too is waived. *Hollon*, 47 F.3d at 491.

But even if it were not waived, it would be meritless. ALJs must "consider all evidence available in [an] individual's case record." 42 U.S.C. § 423(d)(5)(B). In carrying out that duty,

> an ALJ may not selectively include only those portions of the
> medical evidence that places a claimant in a capable light, and fail

29

to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See*, *e.g.*, *Gentry* [*v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)] (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson* [*v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)] (finding error where the ALJ was "selective in parsing the various medical reports") *see also Williams v. Colvin*, 2017 WL 1319781 at * 16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted by*, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015), *report and recommendation adopted by*, 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.") … *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.["]).

*Davidson v. Berryhill*, No. 16-cv-2621, 2017 WL 4682343, at 17 (N.D. Ohio Oct. 18, 2017). At the same time, the Sixth Circuit has noted that cherry-picking arguments can "cut[] both ways," as they may turn on whether the ALJ's decision falls within his "zone of choice." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009). Indeed, what plaintiff-appellants have called cherry-picking "can [at times] be described more neutrally as weighing the evidence," and the claimant bears the burden of persuading the court "that the ALJ erred in conducting this difficult task." *Id.* at 284.

Overstreet's "cherry pick[ed]" argument is a single sentence within her discussion of the ALJ's decision to not include in the RFC limitations for flexible break times and non-confrontational feedback. (ECF No. 15, PageID #: 736 ("Cherry picking the findings of the reviewing psychologists resulted in harmful error to Overstreet.")). From that context, the Court construes Overstreet's objection to be another attack on the ALJ's decision concerning the State

Agency psychological consultants' opinions on those potential limitations.

As discussed above, the Court is satisfied that the ALJ properly and fully considered the medical and non-medical evidence in the record, including the State Agency psychological consultants' opinions. The ALJ adopted nearly all of the State Agency psychological consultants' opinions and, as discussed above, did not adopt those opinions that did not call for a concrete limitation to Overstreet's RFC. Finally, he adopted a more limiting restriction concerning Overstreet's inability to interact with the general public. (ECF No. 12, PageID #: 86). Overstreet's cherry-picking argument merely asks the Court to reweigh the evidence in the record and find it to be more favorable to her. *White*, 572 F.3d at 284-85. That is outside of the Court's purview. The ALJ's decision concerning the State Agency psychological consultants' opinions was within his "zone of choice," and substantial evidence supports that decision. *Id.* Accordingly, the ALJ did not cherry pick, *i.e.*, impermissibly parse, the record evidence as Overstreet asserts.

## VI.    Recommendation

Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

DATED: May 17, 2021

*Carmen Henderson*

Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).